# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **In re** <br><br> **RAYMOND E. MCMILLEN, JR.,** <br><br>                        **Debtor** <br> _____ <br><br> **RAYMOND E. MCMILLEN, JR.,** <br><br>                        **Plaintiff** <br><br> v. <br><br> **MARC KADIS,** <br><br>                        **Defendant/** <br>     **Plaintiff in Counterclaim** <br><br> v. <br><br> **RAYMOND E. MCMILLEN, JR.,** <br><br>     **Defendant in Counterclaim** | **Chapter 13** <br> **Case No. 02-18501-WH** <br><br><br><br><br><br><br><br> **Adversary Proceeding** <br> **No. 04-1140** |

### MEMORANDUM OF DECISION

      While in a case under chapter 13, and facing imminent foreclosure on his home, Debtor Raymond McMillen entered into a court-approved purchase and sale agreement with Defendant Marc Kadis: Kadis would purchase the home at a bargain-basement price but permit McMillen to continue living in it for five years, the first year's rent to be deferred, and give McMillen a five-year option to buy the home back at fair market value. Kadis did purchase the home but also announced his intention not to the pay final installment of the purchase price, a $75,000 payment due seven years after the closing; he has also failed to give a mortgage securing that obligation, as further required by the agreement. McMillen, for his part, occupied the property for the five-year lease term but paid no rent. McMillen now sues for recision of the

agreement—citing Kadis's breach and arguing fraud, duress, and unjust enrichment—and for damages under Massachusetts G.L. c. 93A. Kadis counterclaims for the rent. The matter having been tried, I now enter the following findings of fact and conclusions of law.

**FINDINGS OF FACT**

Raymond McMillen filed a petition for relief under Chapter 13 of the Bankruptcy Code on September 25, 2001, thus commencing bankruptcy case No. 01-17472. At the time, he was the owner of the real property located at 17 Bow Street, Wellesley, Massachusetts ("the Property"), where he and his family had resided since 1971. The Property was encumbered by a mortgage in favor of Ameriquest Mortgage Company ("Ameriquest"), and this mortgage was in default. Ameriquest sought and obtained relief from the automatic stay and scheduled a foreclosure sale for November 25, 2002. On November 22, 2002, while the first case remained open, McMillen filed another petition for relief under Chapter 13, thereby commencing the present case.

On December 2, 2002, McMillen and Kadis entered into a purchase and sale agreement.[1] The material terms of the agreement were as follows:

1. Kadis was to pay a total purchase price of $250,000, including a cash payment of $150,000 at the closing and a further cash payment of $100,000 on the seventh anniversary of the closing.

2. Kadis was to secure his obligation to make a cash payment of $100,000 on the seventh anniversary of the closing by giving McMillen a mortgage on the property, which mortgage obligation would bear no interest and require payment of principal in full only at maturity.

3. Kadis's obligation to provide a mortgage would survive the closing.

---

[1] The purchase and sale agreement and the supplemental lease agreement were memorialized in part on December 2 and in full by December 6, 2002.

2

4. Kadis's obligation to provide a mortgage "is based on buyer's estimate of the cost of repair of the property, and the parties agree that the amount of this mortgage may be adjusted by subsequent agreement."[2]

5. Kadis was to lease the property back to McMillen for a term of five years; the rate for the first year was $1200 per month; the rental rate would increase by $100 per month in each successive year; and payment of the rent for the first year was to be deferred, with payment of the first year's rent to be made at the rate of $300 per month for 48 months, commencing in the first month of the second year of the lease.

6. During the five year term of the lease, McMillen would enjoy the exclusive option to buy back the property for fair market value, and this provision too would survive the closing.[3]

7. The property was to be conveyed to Kadis free and clear of liens.[4]

8. The agreement was subject to approval of the bankruptcy court and would not be effective or binding on either party until so approved.[5]

On December 3, 2002, McMillen filed, in the second case, a motion for leave to sell the Property to Marc Kadis free and clear of liens. The motion set forth the terms of the purchase and sale agreement. As McMillen explained in the motion, the initial proceeds of the sale would permit him to pay in full the first and second mortgages on the property and his remaining obligations under his chapter 13 plan.

On December 9, 2002, McMillen filed an amended motion for leave to sell the Property to Marc Kadis free and clear of liens, setting forth the same terms as are set forth above. Ameriquest filed an objection, stating that $150,000 (the amount payable by Kadis upon closing) would not be sufficient to satisfy its mortgage in full. The Court held a hearing on the amended

---

[2] Rider to Purchase and Sale Agreement, ¶ 9.

[3] The purchase and sale agreement did not specify how fair market value was to be determined.

[4] Purchase and Sale Agreement, ¶ 31.

[5] Purchase and Sale Agreement, ¶ 31.

3

sale motion on December 16, 2002, at which McMillen, his attorney, and Kadis were in attendance. Prior to the hearing, and in order to permit McMillen to have sufficient funds to cover the existing mortgages and to fund in full his chapter 13 plan, the parties modified their agreement to specify that the payment due upon closing would be increased to $175,000 and the balance due on the seventh anniversary reduced to $75,000. In an order agreed to by both McMillen and Kadis, as attested by their respective signatures thereon, the Court, by Judge Carol Kenner, approved the agreement as so amended, stating, "[t]he cash portion of the sale price is $175,000 and a mortgage in the amount of $75,000 is authorized."

Kadis maintains that, prior to this hearing, he and McMillen also agreed that the second payment would be stricken from the agreement altogether, and therefore that Kadis would neither give nor be obligated to give McMillen a mortgage to secure a second payment. The evidence shows that, at some point *after* the sale hearing,[6] Kadis informed McMillen that he would not pay anything beyond the initial $175,000 payment. This communication occurred after the sale hearing but before the closing, as Kadis himself remembers it. Had Kadis made the statement at or before the sale hearing, he would not have agreed to the provision in the sale order that expressly authorized a mortgage of only $75,000 instead of $100,000. There is no writing or other evidence that McMillen agreed to this modification, and I find that he did not agree to it. In fact, according to Kadis's own testimony, Kadis did not present this modification to McMillen as a *proposed* modification, for acceptance or rejection; rather, Kadis simply told McMillen that this was what he planned to do. Moreover, the alleged modification is inconsistent with the provision in the sale order—to which Kadis himself agreed—authorizing a

---

[6] Kadis, in agreement with McMillen, testified that this occurred after the sale hearing. Transcript, pp. 54 and 82. Kadis's own testimony is thus at odds with his proposed finding of fact as to the timing of this communication.

4

mortgage of only $75,000 instead of $100,000. Had the second payment been removed from the agreement, the authorization of any mortgage would have been unnecessary and nonsensical.

On the same day as the sale hearing, the bankruptcy court also allowed a Motion by Ameriquest for relief from the automatic stay to foreclose on the property that was the subject of the sale hearing. Consequently, McMillen was under pressure to close the sale to Kadis soon, lest he lose the home to foreclosure. Notwithstanding Kadis's announcement that he would not pay McMillen anything more than the initial $175,000 cash payment, McMillen did in fact go forward with the sale. He did so to avert loss of the house to foreclosure, to preserve his right to live in it for the term of the lease with Kadis, and to ensure himself the right to buy the property back from Kadis at a later date, pursuant to the exclusive option granted him by the purchase and sale agreement. He did not believe, or indicate to Kadis, that he had assented to elimination of the $75,000 second payment, and the mortgage securing it, from the purchase and sale agreement. Faced with imminent foreclosure, he was simply leaving the performance and enforcement of that obligation to another day.

The sale closed on December 20, 2002. Attorney David Baker represented McMillen at the closing; Kadis represented himself. By quitclaim deed prepared by McMillen's attorney, McMillen transferred his interest in the property to Kadis, expressly reserving a possessory estate for the life of McMillen, or for five years from the date of the deed, whichever came first. At the closing, Kadis paid $175,000 in cash. Despite repeated demands from McMillen's attorney, he did *not* also give McMillen a mortgage to secure the $75,000 balance of the purchase price. By virtue of the $175,000 that McMillen received at the closing, the Debtor paid off the existing mortgages on the property, completed his chapter 13 plan payments, and received a discharge.

The deed from McMillen to Kadis recited that the conveyance was "for consideration paid in the amount of [$175,000] and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged[.]" Kadis cites this as evidence that McMillen had accepted Kadis's reduction of the purchase price to $175,000. I do not construe this language as evidence that McMillen accepted Kadis's reduction. The deed expressly states that the consideration includes, in addition to $175,000, "other good and valuable consideration."Kadis's promise of an additional $75,000 and of a mortgage to secure it certainly qualifies as "other good and valuable consideration" received. The language of the deed is not evidence that McMillen agreed to Kadis's modification.

McMillen alleges that Kadis entered into the purchase and sale agreement without intention to pay the $75,000 second payment and that Kadis, in entering into the agreement, misrepresented to McMillen his intention as to the second payment. McMillen has not proven these allegations by a preponderance of the evidence. The evidence suggests instead that Kadis decided not to make the second payment only after the agreement had been initially entered into and even after it was modified to shift $25,000 of the consideration from the second payment to the first. The evidence does not support a finding that Kadis entered into the agreement without intent to honor his promise to make the second payment. Kadis resolved not to make the second payment only after the agreement had been entered into and then modified.

After the closing, McMillen through his attorney David Baker, repeatedly demanded of Kadis that he execute the mortgage required by the purchase and sale agreement, but Kadis never did give McMillen a mortgage on the property to secure the second payment.

McMillen and his family occupied the property for the five-year duration of the lease that constituted part of the purchase and sale agreement. At no time has he paid Kadis rent in any

6

amount.

Kadis alleges that McMillen entered into the purchase and sale agreement without intention to pay his rental obligations thereunder. He bases this allegation on two established facts: first, that at the time of the purchase and sale agreement, McMillen lacked the financial wherewithal to afford the rent; and second, that McMillen never paid any rent. The allegation is not supported by a preponderance of the evidence. In view of McMillen's insufficiency of income, the parties expressly agreed to deferment of the first year's rent, but both parties also anticipated that he would be better able to pay the rent after the first year. Kadis has not shown that the expectation was unrealistic. In any event, it was the parties' true expectation, both parties having acted on the basis of it. Moreover, McMillen's failure to pay rent is more likely attributable to an event that occurred after he entered into the contract: Kadis's announcement that he would not make the $75,000 second payment required by their agreement. In view of this intervening cause, I see no reason to attribute his nonpayment to an original intent not to pay.

Since the sale, Kadis has paid the real estate taxes on the property, the water and sewer bills, and the hazard insurance, but no evidence has been submitted as to the amount he has paid. During the same time, he made minor repairs to the property on one or two occasions. The cost of these repairs is not in evidence. McMillen has not otherwise permitted Kadis to come onto the property for inspections or repairs.

Kadis alleges that McMillen failed to deliver title free of liens, as was required by the purchase and sale agreement. He makes this allegation because the Town of Wellesley billed him for taxes against the property that accrued before the sale. The evidence nonetheless shows that McMillen, in his amended sale motion, sought authority to sell the property free and clear of liens, and that the Court, by the agreed order of December 16, 2002, allowed the motion,

7

including (as part of the motion) this demand. The Court thus did enter an order approving the sale of the property free and clear of liens under 11 U.S.C. § 363(f). By virtue of this order, McMillen satisfied his obligation to deliver the property free and clear of liens. Whether Kadis took advantage of the order is an issue on which I need make no finding.

At some point approximately one year after the sale of the property, McMillen offered to repurchase the property from Kadis for $195,000. Kadis rejected the offer. No evidence has been offered that $195,000 was the fair market value of the property at the time of the offer. The parties have submitted little evidence of value, consisting principally of their own opinions. The Debtor himself opined that the fair market value at the time of the sale was in excess of $400,000. No evidence of a lower value was presented by any party. McMillen never offered to buy the property back at any other time or for another price.

## **JURISDICTION**

Insofar as the contract at issue in this proceeding was entered into and approved in the course of the Debtor's administering his estate in bankruptcy, the parties' dispute concerning formation, breach, recision, and enforcement of the contract is a core proceeding. 28 U.S.C. § 157(b)(2)(A) (core proceedings include matters concerning the administration of the estate). The Court has authority to enter final judgment in the matter.

## **DISCUSSION**

The various counts in the complaint and the counterclaim all arise under state law. The purchase and sale agreement was negotiated, entered into, and closed in Massachusetts; it concerns the sale and rental of Massachusetts real estate; and it specifies that it is to be construed

8

as a Massachusetts contract. For these reasons, the governing state law is that of the Commonwealth of Massachusetts.

**McMillen's Complaint**

    a. **The Second Payment**

The first issue presented by McMillen's complaint is whether, as Kadis contends, the purchase and sale agreement was modified to reduce the purchase price to $175,000, without requirement of a second payment and of a mortgage to secure it. The Court concludes that the agreement was *not* so modified. The parties' initial agreement provided for a purchase price of $250,000, with $150,000 to be paid at the closing and $100,000 to be paid on the seventh anniversary of the closing, and it further required that Kadis give McMillen a mortgage at the closing to secure the second payment. After they entered into this initial agreement, but prior to the bankruptcy court hearing on approval of the sale, the parties modified their agreement to increase the initial payment by $25,000 and to reduce the second payment and mortgage by the same amount. The court then approved the agreement, whereupon the agreement became effective and binding on both parties.[7] After the Court's approval of the agreement, Kadis told McMillen that he did not intend to make the second payment, but McMillen never agreed to this

---

[7] The agreement expressly provided that it was subject to approval of the bankruptcy court and would not be effective or binding on either party until so approved. I find by a preponderance of the evidence that Kadis announced his modification of the contract only after the bankruptcy court approved the agreement. But even if the modification was announced before the court approved the sale, the modification would not have been effective. Prior to the court's approval of the sale agreement, the agreement was not binding, and therefore either party was free to rescind it unilaterally. Even before court approval, however, the parties were not free to *modify* the agreement unilaterally. The agreement permitted modification of the amount of the mortgage only "by agreement." Kadis does not purport to have rescinded the agreement. Rather, he purports to have modified the agreement, and the evidence shows that McMillen never agreed to the proposed modification.

9

proposed modification to the contract. The agreement expressly provided that Kadis's obligation to provide a mortgage "is based on buyer's estimate of the cost of repair of the property, and the parties agree that the amount of this mortgage may be adjusted by subsequent agreement." The agreement permitted modification of the mortgage amount only "by subsequent agreement." Having found that McMillen never agreed to Kadis's modification, I conclude that the contract was never modified to eliminate the requirements of a $75,000 second payment and of a mortgage to secure it. Kadis remains bound to make this payment on December 20, 2009, the seventh anniversary of the closing.[8]

As the date for payment has not yet arrived, Kadis has not yet breached his obligation to pay. However, Kadis has already breached his obligation to give a mortgage, and, especially in view of Kadis's repudiation of his obligation to make the second payment, this breach has resulted in damage to McMillen in the amount of $75,000. McMillen is therefore entitled to damages for breach in the amount of $75,000.

### b. **Recision**

Although McMillen has demanded damages for Kadis's breach of his obligation to give a mortgage and repudiation of his obligation to make the second payment, he would prefer instead

---

[8] Kadis argues that the language of the agreed order approving the sale—"a mortgage in the amount of $75,000 *is authorized*" (emphasis added)—indicates that the mortgage and second payment were not required but merely optional. This argument holds no water. First, at the time of the hearing, Kadis had not yet even announced that he would not make the second payment; the elimination of the second payment was not a subject of the sale hearing or of the order; it was not yet even a subject of discussion between the parties. Second, the sentence in question clearly was intended to approve and require a shift of $25,000 of the purchase price from the second payment to the first; it is not necessary to read anything more into the sentence than that. Insofar as the word "authorized" is construed here as extending permission to Kadis, the permission is to reduce the mortgage from $100,000 to $75,000, not to give no mortgage at all. I therefore find no cause to construe the language in question as Kadis proposes.

10

that the court rescind the purchase and sale agreement. To effect this recision, he suggests, the Court should return title to the property to him upon his restoring to Kadis a sum equal to the amount paid by Kadis to purchase, hold, and maintain the property.[9] He argues that recision is appropriate because Kadis committed fraud in the inducement by representing to McMillen that he would make a second payment of $75,000 when in fact he had no intention of making the second payment. McMillen argues that by this misrepresentation of intent, Kadis induced him to enter into the purchase and sale agreement under false pretenses.

McMillen has failed to prove this allegation by a preponderance of the evidence. The evidence suggests that Kadis decided not to make the second payment only after the agreement had been initially entered into, then modified to shift $25,000 of the consideration from the second payment to the first, and then approved by the Court. When he entered into the agreement and thereby made his promise to make a second payment, he *did* intend to honor the promise. He did not make his promise without intent to honor it. There was therefore no fraud in the inducement. Consequently, McMillen has shown no basis for recision.[10]

Recision is also unavailable for a second reason. McMillen learned of Kadis's change of

---

[9] Though McMillen has not precisely quantified this amount, he apparently believes this payment to Kadis would total approximately $200,000 and that he could fund the payment by obtaining a reverse mortgage on the property.

[10] Although McMillen does not mention duress in his complaint, he makes passing reference, in his proposed findings and conclusions, to duress as a basis for repudiation or recision. His argument is undeveloped and, at best, unclear. He seems to argue that the contract should be voidable at McMillen's option because he entered into the agreement only under force of economic circumstance, as the only alternative to losing his home to foreclosure. This argument has no merit. As Kadis correctly argues, the circumstances that compelled McMillen into this agreement were not of Kadis's making, and coercion sufficient to avoid a contract requires that the coercive circumstances have been the result of coercive acts of the other party the contract. *International Underwater Contractors, Inc. v. New England Tel. and Tel.*, 8 Mass. App. Ct. 340, 342 (1979). Duress is therefore of no assistance to McMillen.

position as to the second payment before the closing of the sale. At that point, McMillen had the option of not going forward with the sale and of treating the purchase and sale agreement as rescinded. Instead, he himself elected to go forward under the agreement by closing the sale. He is entitled to enforce the agreement, but having elected to proceed under the contract, he can not now seek its recision.

### c. G.L. c. 93A

McMillen also seeks multiples damages, attorney's fees, and recision under the Massachusetts Consumer Protection Act, G.L. c. 93A. In order to prosecute his claim under that statute, McMillen was obligated first to make a written demand for relief upon Kadis in accordance with § 9(3) of the Act. G.L c. 93A, § 9(3). The demand letter is a jurisdictional prerequisite to suit under the Consumer Protection Act. *Bushay v. McDonnell (In re Bushay)*, 327 B.R. 695, 702 (1st Cir BAP 2005), *aff'd* 187 Fed.Appx. 17 (1st Cir. 2006). McMillen has neither alleged nor shown evidence of compliance with this requirement. Accordingly, his count under G.L. c. 93A is dismissed.

### d. Unjust Enrichment

McMillen also asserts a claim for unjust enrichment, under which the Court is asked to restore the parties to the status quo—in essence, to rescind the sale. However, he asks for this remedy only if the court believes his breach of contract claim is not proven. The Court having determined that McMillen is entitled to relief for breach of contract, the Court need not address the merits of the count for unjust enrichment.

**Kadis's Counterclaim**

In his counterclaim, Kadis asserts counts for fraud, breach of contract, unjust enrichment, and violation of the lease agreement.

    a. **Fraud**

In his count for fraud, Kadis contends that McMillen induced him to enter into the purchase and sale agreement by, in part, promising to pay rent for his occupancy of the premises during the term of the lease, but that McMillen had no intent to make the payments so promised. Although McMillen did indeed breach his obligation to pay rent, I find that Kadis has failed to establish that McMillen made the promise to pay rent without intent to honor that promise. Without proof that McMillen misrepresented his intent, this count must fail.

    b. **Breach of Contract**

In his count for breach of contract, Kadis seeks damages for McMillen's failure to pay the rent due under the lease portion of the purchase and sale agreement. The damages he seeks include the unpaid rent and the attorney's fees incurred to collect them. I find that the lease had a term of five years and required payment of rent at the rate of $1,200 per month for the first year, $1,300 per month for the second year, $1,400 per month for the third year, $1,500 per month for the fourth year, and $1,600 per month for the fifth year, for total rent over the term of the lease of $84,000. McMillen having paid no rent, Kadis has been damaged by McMillen's breach in the amount of $84,000. The lease also expressly provides that Kadis is entitled to reasonable attorney's fees incurred in collection of rental arrears.[11] Kadis, however, has adduced

---

[11] Trial Exhibit H, Lease Agreement, ¶ 23.

no evidence of the extent of the fees he has incurred in collecting the rent, and for that reason no damages may be awarded for attorney's fees. Damages for breach of contract shall be limited to the rental arrears.

### c. Unjust Enrichment

By his count for unjust enrichment, Kadis seeks compensation for McMillen's use and occupation of the property during the lease term. By this count, he seeks a remedy in equity in the event that his count for rent under the contract is disallowed. The Court having already determined that Kadis is entitled under the contract to damages in the amount of the unpaid rent, this count is moot. Moreover, as there exists an adequate remedy at law, no further remedy is available in equity.

### d. Violation of the Lease Agreement

By this last count, Kadis alleges that McMillen has further breached the lease agreement by denying him (Kadis) access to the property for the purpose of making repairs. He further seeks a determination that he is entitled to possession of the premises on account of this breach. Kadis does not address this count in his proposed findings and conclusions. The evidence shows that McMillen did twice give Kadis access to the premises for purposes of making repairs, and that on unspecified other occasions, McMillen denied Kadis access to inspect the premises or to effectuate repairs. Kadis has submitted no evidence as to what (if any) damages were suffered on account of denial of access. Indeed he has supplied no details as to these incidents. I therefore cannot find that Kadis is entitled to damages for this alleged breach.

The request for a determination that Kadis is entitled to possession, either for these

actions or for nonpayment of rent, is moot because the lease term (and McMillen's reserved "life estate") has now expired. Insofar as Kadis has not addressed the issue of possession in his post-trial submissions, I will not address that issue here.[12] However, the judgment herein shall be without prejudice to Kadis's seeking possession through the appropriate avenue in the state courts. I make no ruling on the merits of that issue.

**CONCLUSION**

For the reasons set forth above, I conclude that McMillen is entitled to recover from Kadis the sum of $75,000 for breach of the obligation to give a mortgage in that amount, and that Kadis is entitled to recover from McMillen the sum of $84,000 for rent. These obligations shall be set off against each other, resulting in a net right of recovery for Kadis and against McMillen in the amount of $9,000. A separate judgment will enter accordingly.

Date: May 7, 2008

_____
William C. Hillman
United States Bankruptcy Judge

---

[12] At the time of trial (but not still at present), McMillen still held a "life estate" (in fact, an estate for years) in the property, and so it is not clear that Kadis had a right to possession.